**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------X
PATRICIA LYNCH,

               Plaintiff,

     -against-

THE SOUTHAMPTON ANIMAL SHELTER
FOUNDATION INC., SUSAN ALLEN,
SUSAN KELLY, THE TOWN OF
SOUTHAMPTON, and DONALD
BAMBRICK,

               Defendants.

  --------------------------------------------------X

**FILED**
**CLERK**

9/19/2013 10:23 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**
10-CV-2917 (ADS) (ARL)

## APPEARANCES:

**The Law Offices of Steven A. Morelli, P.C**
*Attorneys for the Plaintiff*
1461 Franklin Avenue
Garden City, NY 11530
     By:  Steven A. Morelli, Esq.

**Eris S. Tilton, P.L.L.C.**
*Attorneys for the Plaintiff*
193 East Main Street
Babylon, NY 11702
     By:  Eric S. Tilton, Esq., Of Counsel

**Ohrenstein & Brown**
*Attorneys for all the Defendants*
101 Franklin Avenue, Suite 300
Garden City, NY 11530
     By:  Michael D. Brown, Esq.
        Rosario DeVito, Esq., Of Counsel

**Humes & Wagner, LLP**
*Attorneys for the Defendants Town of Southampton and Donald Bambrick*
850 Third Avenue, 18th Floor
New York, NY 10022
     By:  Brian A. Smith, Esq., Of Counsel

**SPATT, District Judge**.

This is the second case to come before this Court involving the written and spoken criticism of the animal euthanasia policy and operational policies at the Southampton Animal Shelter (the "Shelter") by the Plaintiff Patricia Lynch (the "Plaintiff"). The events underlying the first case, Lynch v. Town of Southampton ("Lynch I"), No. 05-CV-4499 (Spatt, J.), took place when the Shelter was operated by the Defendant Town of Southampton (the "Town") and arose from the Town's decision to terminate the Plaintiff as a volunteer at the Shelter on February 27, 2004. In addition to the Town, the Plaintiff named her supervisor Donald Bambrick ("Bambrick") as a defendant in the case. After a jury trial, the Town, but not Bambrick, was held liable pursuant to 42 U.S.C. § 1983 for retaliating against the Plaintiff for exercising her First Amendment right to free speech.

Subsequent to the resolution of Lynch I, the Town entered into an agreement on December 29, 2009, with the Southampton Animal Shelter Foundation, Inc. (the "Foundation") to privatize aspects of the Shelter's operations. On January 12, 2010, after the Foundation assumed control of the Shelter, Lynch's application to volunteer at the Shelter was denied. As a result, the Plaintiff commenced the instant action against the Foundation, its senior officer and director Susan Allen ("Allen"), the Director of Personnel Susan Kelly ("Kelly" and, together with the Foundation and Allen, the "Foundation Defendants"), as well as the Town and Bambrick (the "Town Defendants"). The Plaintiff alleges that the Foundation Defendants and the Town Defendants (collectively the "Defendants") denied her application to volunteer at the Shelter in retaliation for her exercising of her First Amendment rights to free speech and to petition the government for redress of her grievances in violation of 42 U.S.C. §§ 1983, 1985, and 1986.

2

Presently before the Court are the Defendants' motion for summary judgment and the Plaintiff's cross-motion for summary judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. For the reasons and in the manner set forth below, the Court grants in part and denies in part the respective motions for summary judgment. In this regard, the Court grants summary judgment in favor of the Defendants as to the Plaintiff's §§ 1985 and 1986 claims. However, the Court declines to grant summary judgment as to the Plaintiff's § 1983 civil rights claim and § 1983 conspiracy claim, except that the Court does find as a matter of law that the public function test does not apply in this case and therefore grants summary judgment in favor of the Defendants with respect to that issue.

## I. BACKGROUND

### A. The Plaintiff's Initial Involvement with the Shelter and Lynch I

The Plaintiff is an investigative journalist and an animal rights advocate. Beginning in October 2000, she started volunteering at the Shelter. At that time, the Shelter was operated by the Defendant Town, and was supervised by the Defendant Bambrick, who held the title of Senior Animal Control Officer. However, the Plaintiff's involvement with the Shelter extended beyond that of a volunteer. In this regard, in January 2001, she produced a documentary film about conditions at the Shelter, and in June of 2003, she began a radio show called "Pet of the Week" to help to get animals adopted by members of the community. In addition, the Plaintiff began writing a newspaper column called "Shelter Stories" for *The Southampton Press* regarding animals for adoption. Through this media and others, the Plaintiff openly criticized: (1) the Shelter's animal euthanasia policies; (2) the Shelter's facility operations; (3) the manner of construction of a new shelter; (4) the use of taxpayer's money in the operations of the Shelter; and (5) the Shelter's adoption policies.

On February 24, 2004, the Plaintiff filed a lawsuit in the state court against the Town seeking an order enjoining the Shelter from euthanizing animals.  See Lynch v. Town of Southampton, Index No. 5966-2004 (N.Y. Sup. Ct., Suffolk County) (the "State Action"). According to the Plaintiff, the Town was given notice of the impending motion for an injunction on February 23, 2004; the request for an injunction was filed on February 24, 2004; and was subsequently covered in the local press on February 25, 2004.  On August 19, 2004, Justice Melvyn Tanenbaum rendered a decision in the State Action, denying the request for an injunction.

On February 27, 2004, three days after the Town received notice of the State Action, The Plaintiff was terminated from her position as a volunteer at the Shelter and banned from further association with the Shelter.  As a result, on September 22, 2005, the Plaintiff commenced Lynch I against the Town and Bambrick alleging that her position was terminated in retaliation for her speech criticizing the Shelter and its policies.  This Court held a jury trial in Lynch I between February 6 and February 12, 2007, and on February 14, 2007, the jury found that the Town, but not Bambrick, had violated the Plaintiff's First Amendment rights by terminating her from her position as a volunteer with the Shelter in retaliation for the statements she had made regarding the conditions, policies and practices at the Shelter.  On December 2, 2008, the Second Circuit affirmed the jury verdict and the judgment.  Lynch v. Town of Southampton, No. 07–3478–cv, 2008 WL 5083010, at *1 (2d Cir. Dec. 02, 2008).  Subsequent to the Second Circuit's decision affirming the jury's verdict in Lynch I, the Shelter permitted the Plaintiff to resume her duties as a volunteer dog walker.

**B.  The Privatization of the Shelter**

In the fall of 2008, confronted with multi-million dollar budgetary deficits and the developing national financial crisis, the Town decided to reduce the 2009 budget for the Shelter. Thereafter, in 2009, the Town considered closing the Shelter as a way to address its continuing budgetary concerns.  The Town also looked into the possibility of privatizing the shelter pursuant to §§ 113 and 114 of the New York State Agriculture and Markets Law ("NYSAML"), formerly §§ 114 and 115 respectively.  Under these provisions, a town may contract animal shelter services with an incorporated humane society or similar incorporated dog protective association.

To that end, on an unspecified date, Town officials met with the Defendants Allen and Kelly, as well as attorney Robert Werbel, Esq. ("Werbel"), to preliminary discuss privatizing the Shelter.  Following this meeting, in October 2009, Allen with other local citizens formed the Foundation.

In the meantime, on August 25, 2009, the Town Board adopted Resolution 2009-933, which authorized a solicitation of proposals for the operation of the Shelter.  On September 3, 2009, after proper legal notice, a request for proposals was made publically available.  The deadline for submitting proposals was September 30, 2009.  By that deadline, two proposals were submitted, one of which was the Foundation's proposal.  On October 16, 2009, the Town Board reviewed the two proposals and ultimately selected the proposal from the Foundation.

On October 30, 2009, pursuant to Resolution 2009-1140, "the Town Board authorize[d] the Town Attorney's Office to complete and finalize contractual negotiations with the [Foundation] for the privatization of the shelter and to produce to the Town Board a report and term sheet on or before November 13, 2009."  (Thorne-Holst Decl., Exh. 3.)  Thus, the Town, through Assistant Town Attorney Joseph Burke, Esq. ("Burke"), and the Foundation, through

Werbel, commenced negotiations. Eventually, the Town and the Foundation agreed upon the basic terms for the privatization of the Shelter, including the limit of the Town's responsibilities and financial contributions for the various services that the Foundation would provide while operating the Shelter. The Town Attorney provided a report to the Town Board, dated November 13, 2009, reflecting "the terms which the parties intended to formalize in an agreement by year-end 2009." (Thorne-Holst Decl., Exh. 4.)

On December 8, 2009, the Town Board adopted Resolution 2009-1313, under which it "authorize[d] the [Town] Supervisor to enter into and execute an Agreement, subject to approval by the Town Attorney's Office, with the [Foundation] to operate and manage the [Shelter] for a three (3) year term, commencing on January 1, 2010[.]" (Thorne-Holst Decl., Exh. 4.) Afterward, the Town and the Foundation, through Burke and Werbel respectively, engaged in final negotiations, and on December 29, 2009, the parties entered into a contract granting the Foundation authority to operate the Shelter (the "Agreement").

As part of the Agreement, the Town and the Foundation agreed that "[t]he Foundation shall be solely responsible for the recruitment, hiring and/or termination of all staff and/or volunteers." (Werbel Decl., Exh. 12.) They further agreed that "[t]he Shelter may operate a volunteer and/or community service program and, in such event, shall assume liability for, appropriately screen, supervise, and train all such volunteers assisting at the Shelter Facility." (Werbel Decl., Exh. 12.)

In addition, according to the Agreement "[t]he Town's Animal Control Officers (including the senior Animal Control Officer, who shall also act as Animal Shelter Supervisor) shall continue to be employees of the Town, notwithstanding that their offices will be located and may continue to be located at the Shelter Facility." (Werbel Decl., Exh. 12.) However,

"[w]hile the Town ha[d] continuing responsibility to compensate [the Defendant] Bambrick for his services as Animal Control Officer, which include[d] responsibilities as the Animal Shelter Supervisor, the parties acknowledge[d] that the Foundation may provide addition compensation to [ ] Bambrick for services he provide[d] to the Shelter[.]" (Werbel Decl., Exh. 12.) Further, the Agreement stated that "[t]he Animal Shelter Supervisor (presently [ ] Bambrick) shall oversee the Shelter and be required to assist with Shelter operations with staff support from Animal Control Officers as determined to be necessary by the Animal Shelter Supervisor" and that "[t]he Shelter employees shall report directly to the Animal Shelter Supervisor." (Werbel Decl., Exh. 12.)

In preparation for assuming operation of the Shelter, the Foundation collected volunteer applications from other animal shelters in order to create its own volunteer application. Foundation directors and board members Allen, Sonia Shotland, Jonathan McCann, Steven Greenfield and Dorothy Frankel, as well as volunteer coordinator Cathy Duemler ("Duemler"), all contributed to the development of the volunteer application, but Duemler apparently had the greatest input. Relying on the Town supervisor's declaration and Bambrick's deposition testimony, the Town asserts that neither it nor Bambrick took part in creating the Foundation's volunteer application.

Nevertheless, according to the Plaintiff, Bambrick did go about gathering information on other shelters' volunteer applications. In this regard, she claims that "Gillian Woods Pultz, Executive Director and Animal Control Officer at North Fork Animal Welfare League, Inc. [("Pultz")], informed her that Bambrick and Allen gathered information about private shelter's (including her own) volunteer applications, as well as other information into how other shelters

were run." (Lynch Decl., ¶ 63.) However, the Plaintiff has not included either an affidavit or deposition testimony from Pultz in support of her contention.

On January 1, 2010, the Agreement went into effect and the Foundation assumed responsibility for operating the Shelter. As per the Agreement, the Foundation did not assume any obligations for animal control functions, which remained under the purview of the Town pursuant to NYSAML Article 7, §§ 114 and 115. However, the Town's Animal Control Unit and the Foundation-operated Shelter were located together in the same facility. With respect to volunteers, the Foundation required that all prospective volunteers complete a volunteer application before they would be permitted to participate as a volunteer. As part of the application, prospective volunteers were expected to indicate whether they had ever been convicted of a crime or whether they had ever been a party to any litigation against any organization.

In addition, under the Agreement, the Town's financial commitment to the Shelter in 2010 was $200,000, which was budgeted as follows: (1) $8,000 for Shelter structural repairs; (2) $10,600 for Shelter electrical and plumbing repairs; (3) $7,800 for insurance; (4) a maximum of $80,000 for electricity payable directly to the utility company; (5) a maximum of $60,000 for gas payable directly to the utility company; and (6) $33,600 for the boarding of stray animals delivered to the Shelter by the Town. This contribution constituted 13% of the Foundation's 2010 operating budget, which was $1,542,474. As a consequence, the Town's 2009 "Adopted Budget" of $745,558 was reduced to $200,000, resulting in a $535,558 savings for the Town.

## C. The Denial of the Plaintiff's Volunteer Application

One week after the Foundation took control of the Shelter, on January 7, 2010, the Plaintiff came to the Shelter to volunteer. At the time, Linda Goldsmith ("Goldsmith"), an

employee of the Foundation, was at the front desk. Goldsmith informed the Plaintiff that she was required to fill out a volunteer application. Allegedly, the Plaintiff was annoyed and unhappy that she would be unable to walk a dog until she completed a volunteer application and it was approved. Although she had apparently made the trip from New York City to Southampton for reasons unrelated to volunteering at the Shelter, she still felt that the Shelter could have called her and notified her that she would not be allowed to walk dogs that day. According to the Defendant Kelly, the Plaintiff began to protest loudly that she should not have to fill out an application. Upon hearing the commotion, Kelly left her office and spoke to the Plaintiff.

Eventually, according to the Defendants, the Plaintiff only partially completed the volunteer application. However, the Plaintiff claims she "filled out the application form honestly, as she was asked to do." (Pl. Mem., pg. 7.) She also claims that she received an application that was "formatted differently than the forms which other volunteers were given." (Pl. Mem., pg. 7.) However, the Defendants dispute this and claim that she received the same four-page application as other prospective volunteers, but that the application was subsequently changed in form to include a line for the applicant to enter his or her driver's license number.

On her application, the Plaintiff answered the question "Have you ever been party to any litigation against any organization?" in the affirmative. (Brown Decl., Exh. 11.) Where she was asked to explain, she added "NBC News/Lyndon LaRouche/Synanon" with no further explanation. (Brown Decl., Exh. 11.) Under the Foundation's policy, anyone who answers yes to either the question regarding a criminal record or the question involving prior litigation had their application referred to the Foundation's counsel for review.

Beginning on January 9, 2010, Kelly and the Plaintiff exchanged emails concerning the Plaintiff's application and, more specifically, about the Plaintiff's response to the question regarding previous litigation.  In one email from the Plaintiff to Kelly, the Plaintiff  CC-ed Assistant Town Attorney Burke and indicated that she had met with him concerning the appropriateness of the prior litigation question on the volunteer application form.  She also responded to Kelly's request for information regarding the previous litigation that she had been involved in, including <u>Lynch I</u>.  On January 9. 2010, Kelly forwarded the Plaintiff's emails to attorney Werbel and the Defendant Bambrick with the messages "she responded with 2 emails" and "letter 2 from Ms [sic] Lynch."  (Brown Decl., Exhs. 14, 15.)

At some point between January 7, 2010 and January 12, 2010, Kelly spoke with Allen about the Plaintiff's visit to the Shelter on January 7 and the alleged disruption she caused.  Kelly could not recall whether she informed Allen that she was inclined to reject the Plaintiff's application subject to speaking with attorney Werbel.  Allen told Kelly that in the past, the Plaintiff had been disrespectful to both staff and other volunteers at the Shelter.  She also advised Kelly that the Plaintiff had attempted to instigate a Utah-Group known as "Best Friends" to sue Allen for using the name "Best Friends" in connection with a group of Shelter volunteers and people Allen paid to perform services at the Shelter.  According to Kelly, Allen's information corroborated the impression she had of Lynch based both on a report she received from the Shelter in late 2009 and her personal experience with her on January 7, 2010.

On January 12, 2010, Kelly advised the Plaintiff that her application to volunteer had been denied.  According to Kelly, while acting as the Personnel Director for the Foundation and after seeking the advice of counsel, she made the decision to reject the Plaintiff's application.  Her alleged reasons for rejecting the application included (1) the conduct of the Plaintiff she had

personally witnessed; (2) the Plaintiff's supposed "general litigious nature"; (3) information she had received from others at the Shelter suggesting that the Plaintiff was "disruptive" and had a "disregard of regulations"; and (4) the need to protect the interests of the Foundation. (Brown Decl., Exh. 5.) The Defendants claim that neither the Town nor Bambrick participated in the decision to reject the Plaintiff's application. Further, at her deposition, Kelly testified that the Plaintiff was the only individual that she recalled who indicated that she was a party to litigation and that the Plaintiff was the only prospective individual that she recalled who was rejected as a volunteer.

On June 24, 2010, the Plaintiff filed the instant action alleging that the Town Defendants and the Foundation Defendants either jointly or as part of a conspiracy, denied her application to volunteer at the Shelter in retaliation for her exercising of her First Amendment rights to free speech and to petition the government for redress of her grievances in violation of 42 U.S.C. §§ 1983, 1985, and 1986. Although this adverse employment action is different, the underlying speech that the Plaintiff contends serves as the basis for the retaliation is the same as the speech involved in Lynch I. According to the Plaintiff, as a result of the Defendants' alleged actions, she has suffered severe emotional and psychological distress, as well as serious harm to her reputation and credibility.

## II. DISCUSSION

### A. Legal Standard on a Rule 56 Motion for Summary Judgment

It is well-settled that a motion for summary judgment under Fed. R. Civ. P. 56 may be granted by the Court only if the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("Rule 56(c)

provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law."); Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) ("Summary judgment is appropriate where there exists no genuine issue of material fact and based on the undisputed facts, the moving party is entitled to judgment as a matter of law.") (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)) (internal brackets omitted). However, the Court must endeavor to resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion for summary judgment. Anderson, 477 U.S. 242, at 247–48.

Once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted. West-Fair Elec. Contractors v. Aetna Cas. & Surety Co., 78 F.3d 61, 63 (2d Cir. 1996); see also Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (quoting Fed. R. Civ. P. 56(e)). Typically, a genuine issue of material fact exists only if "a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see Vann v. New York City, 72 F.3d 1040, 1049 (2d Cir. 1995). In addition, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

**B. As to Whether the Plaintiff Can Sustain a 42 U.S.C. § 1983 Civil Rights Claim**

In this case, the Defendants argue that the Plaintiff cannot sustain her 42 U.S.C. § 1983 claim because she has failed to establish the existence of any "state action" in connection with the denial of her volunteer application by the Foundation Defendants. However, the Plaintiff contends that she has offered sufficient evidence that the Foundation Defendants are state actors to support her § 1983 civil rights claim.

In pertinent part, § 1983 provides:

> Every person who, under color of . . . [state law] subjects, or
> causes to be subjected, any . . . person within the jurisdiction [of
> the United States] to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law [or a] suit [in] equity . . . .

42 U.S.C. § 1983. A violation is proven when "a person or persons acting under color of state law deprived a plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." McDarby v. Dinkins, 907 F.2d 1334, 1336 (2d Cir. 1990) (citation omitted). In other words, a § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges secured by the Constitution or federal laws. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

The Supreme Court has recognized that a party acts under color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Polk County v. Dodson, 454 U.S. 312, 317–18, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)); see also West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). For purposes of a § 1983 action, a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." West, 487 U.S. at 50, 108 S. Ct. 2250; see also Christian v. Belcher, 888 F.2d 410, 414 (6th Cir. 1989) ("[B]efore a defendant may be held liable under Section 1983, that defendant must first possess power by virtue of state law, then misuse that power in a way that violates federal constitutional rights.").

Accordingly, "[p]rivate actors are not liable under section 1983 unless 'the conduct allegedly causing the deprivation of a federal right can be fairly attributable to the State.'"

Russell v. Aid of Developmentally Disabled, Inc., NO. 12 CV 389(DRH)(AKT), 2013 WL

633573, at *18 (E.D.N.Y. Feb. 20, 2013) (quoting Omnipoint Commc'ns Inc. v. Comi, 233 F.

Supp. 2d 388, 393 (N.D.N.Y. 2002) (in turn, quoting Lugar v. Edmondson Oil Co., 457 U.S.

922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982))) (internal brackets omitted).  In this way,

"constitutional standards are invoked only when it can be said that the State is *responsible* for the

specific conduct of which the plaintiff complains."  TZ Manor, LLC v. Daiens, 815 F. Supp. 2d

726, 738 (S.D.N.Y. 2011) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L.

Ed. 2d 534 (1982)) (emphasis in original).  Of importance, "[t]he plaintiff 'bears the burden of

proof to establish whether a private actor has acted under color of state law.'"  Russell, 2013 WL

633473, at *18 (quoting Omnipoint Commc'ns Inc., 233 F. Supp. 2d at 393).

     In order to determine whether a private actor's conduct is fairly attributable to the State,

courts turn to a number of tests, as follows:

> For the purposes of section 1983, the actions of a nominally private
> entity are attributable to the state when: (1) the entity acts pursuant
> to the "coercive power" of the state or is "controlled" by the state
> ("the compulsion test"); (2) [ ] the state provides "significant
> encouragement" to the entity, the entity is a "willful participant in
> joint activity with the [s]tate," or the entity's functions are
> "entwined" with state policies ("the joint action test" or "close
> nexus test"); or (3) [ ] the entity "has been delegated a public
> function by the [s]tate," ("the public function test").

Sybalski v. Indep. Group Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (per

curiam) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296,

121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)).

     However, "[i]t is not enough [ ] for a plaintiff to plead state involvement in '*some activity*

of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege

that the state was involved 'with the *activity that caused the injury*' giving rise to the action."  Id.

at 257–58 (quoting Schlein v. Milford Hospital, 561 F.2d 427, 428 (2d Cir. 1977)) (emphasis in original); see also Grogan v. Blooming Grove Volunteer Ambulance Corp., 917 F. Supp. 2d 283, 287–88 (S.D.N.Y. 2013) ("Under any test, plaintiff must establish that the state was involved in the specific activity giving rise to her cause of action; it is not enough to show merely that the state was involved in some aspect of the private entity's affairs."). Also, notably, "[t]he determination of whether specific conduct constitutes state action is a 'necessarily fact-bound inquiry.'" Cranley, 318 F.3d at 111–12 (quoting Brentwood, 531 U.S. at 298).

In this case, the Court is confronted with a very unusual circumstance, in that the Foundation Defendants have denied the Plaintiff's request to volunteer at the Shelter – that is, the very same conduct that, when committed by the Town, was found to be unconstitutional in Lynch I. As such, the Court will evaluate the Plaintiff's claims of state involvement under all three tests.

### 1. The Compulsion Test

"Under the 'compulsion test,' a nominally private entity may be considered a state actor when the party acted pursuant to the coercive power of the state or was controlled by the state." Colabella v. American Institute of Certified Public Accountants, No. 10–cv–2291 (KAM)(ALC), 2011 WL 4532132, at *11 (E.D.N.Y. Sept. 28, 2011) (quoting Sybalski, 546 F.3d at 257 (in turn, quoting Brentwood, 531 U.S. at 296)). Put another way, the "compulsion test" is satisfied if "a state 'exercise[s] coercive power or provide[s] such significant encouragement, either overt or covert, that the decision [by the private actor] must in law be deemed that of the State." Miller v. Board of Managers of Whispering Pines at Colonial Woods Condominium II, 457 F. Supp. 2d 126, 130 (E.D.N.Y. 2006) (quoting Archer v. Economic Opportunity Comm'n, 30 F. Supp. 2d 600, 605–06 (E.D.N.Y. 1998) (in turn, quoting Blum, 457 U.S. at 1004)) (internal brackets and

ellipse omitted).  In this regard, courts look at "whether the challenged activity was 'compelled or even influenced' by state regulation." Colabella, 2011 WL 4532132, at *11 (citing Husain v. Springer, 193 F. Supp. 2d 664, 672 (E.D.N.Y. 2002) (in turn, citing Rendell-Baker v. Kohn, 457 U.S. 830, 841, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982))).

In this case, the Defendants argue that there is no evidence that the Town was involved in the Foundation's decision to reject the Plaintiff's application.  The Defendants point to the fact that the Agreement between the Town and the Foundation granted the Foundation exclusive authority over hiring decisions, including the hiring of volunteers.  They further emphasize that the Foundation alone developed the volunteer application and received no input from any Town official, including Bambrick.  On the other hand, the Plaintiff alleges that Kelly must have received input from Bambrick before deciding to reject the Plaintiff's application, since Kelly forwarded the Plaintiff's emails to him for review.  She also claims that Bambrick was involved in developing the volunteer application.

The Court finds that material issues of fact remain so as to make summary judgment inappropriate.  While the Defendants contend that the Foundation's decision to reject the Plaintiff's volunteer application was made without influence from the Town Defendants, they rely primarily on the deposition testimony and declarations of Kelly, Bambrick, Burke and Allen.  Further, although the Plaintiff relies heavily on her own statements, she also offers the emails that Kelly forwarded to Bambrick in which the Plaintiff addressed some of Kelly's concerns regarding her volunteer application.  In the forwarded emails to Bambrick, Kelly attaches the emails she received from the Plaintiff and only writes "she responded with 2 emails" and "letter 2 from Ms [sic] Lynch" without further explanation.  (Brown Decl., Exhs. 14, 15.)  As such, a reasonable jury could find that Kelly did discuss the Plaintiff's volunteer application with

Bambrick and then followed up on their discussion by forwarding the Plaintiff's emails, thereby suggesting that Bambrick was, in fact, involved in the decision to reject the Plaintiff as a volunteer.

Moreover, Kelly admitted that she discussed the Plaintiff's application with Allen and also considered a report concerning the Plaintiff that she received from the Shelter in late 2009, when it was still under the control of the Town. This could indicate to a reasonable jury that the Town offered Kelly unfavorable opinions of the Plaintiff in order to influence her into rejecting the Plaintiff's application to volunteer at the Shelter.

In any event, "[i]t is well-settled that a district court may not make credibility determinations on a motion for summary judgment." Knox v. County of Putnam, No. 10 Civ. 1671(ER), 2012 WL 4462011, at *5 (S.D.N.Y. Sept. 27, 2012) (citing Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010)); see also Bilan v. Davis, No. 11 Civ. 5509(RJS(JLC), 2013 WL 3940562, at *5 n.7 (S.D.N.Y. July 31, 2013), adopted by 2013 WL 4455408, at *1 (S.D.N.Y. Aug. 20, 2013) ("It is well-settled that, on a motion for summary judgment, a court 'should not weigh evidence or assess the credibility of witnesses.'") (quoting Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)). Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Manganiello, 612 F.3d at 161.

While "the Second Circuit has recognized an exception when [a] plaintiff relies almost exclusively on her own testimony," that exception only applies "if no reasonable jury would credit [the] plaintiff's testimony." Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 390 (E.D.N.Y. 2007) (citing Jeffreys v. City of New York, 436 F. 3d 5549, 551 (2d Cir. 2005)). Here, the "Defendants have not pointed to any depositions, interrogatories, or other documents

indicating that [the] [P]laintiff has undermined [her] own credibility by contradicting [herself]" with respect to any of the material issues of this case.  Hizbullah v. McClatchie, No. 05-CV-618A, 2010 WL 826273, at *3 (W.D.N.Y. Mar. 4, 2010).  Moreover, a reasonable jury could find the Plaintiff's allegations that the Town significantly encouraged the Foundation to reject the Plaintiff's application to be credible in light of the emails Kelly forwarded to Bambrick; the fact that Bambrick served as the Animal Shelter Supervisor while also working as a Town official; and the past history between the Plaintiff and the Town Defendants stemming from Lynch I.

At the same time, a reasonable jury could credit the testimony offered by the Defendants and find that the Foundation Defendants acted independently of the Town Defendants and were neither influenced or significantly encouraged by the Town Defendants.  Accordingly, since both the Defendants and the Plaintiff have provided potentially credible versions of how the events at issue transpired, the Court declines to grant summary judgment as to whether the Foundation Defendants could be considered state actors under the compulsion test and leaves this question for a jury to resolve.  See Knox, 2012 WL 4462011, at *5, Hizbullah, 2010 WL 826273, at *3; Davis v. City of New York, 2007 WL 755190, No. 04-CV-3299 (JRB)(RLM), at *8 (E.D.N.Y. Feb. 15, 2007).

### 2.  The Close Nexus or Joint Action Test

Pursuant to the "close nexus" or "joint action" test, "the Court must determine whether there is a 'sufficiently close nexus between the State and the challenged action of the private entity so that the action of the latter may be fairly treated as that of the State itself.'"  Russell, 2013 WL at *19 (quoting Blum, 457 U.S. at 1004) (internal brackets omitted).  In other words, "a private actor can be found 'to act under color of state law for 1983 purposes . . . if the private

party is a willful participant in joint action with the State or its agents.'" Anilao v. Spota, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting Dennis v. Sparks, 449 U.S.. 24, 27, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980)) (internal brackets omitted).

"To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." Id. (quoting Bang v. Utopia Restaurant, 923 F. Supp. 46, 49 (S.D.N.Y.1996)). Thus, similar to the compulsion test, "a nexus of 'state action' exists between a private entity and the state when the state is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert or is entwined with governmental policies." Colabella, 2011 WL 4532132, at *12 (quoting Flagg v. Yonkers Savs. and Loan Ass'n, FA, 396 F.3d 178, 187 (2d Cir. 2005) (in turn, quoting Cranley v. Nat'l Life Ins. Co., 318 F.3d 105, 111 (2d Cir.2003))) (internal brackets and ellipses omitted).

"[O]ne mechanism by which a plaintiff can prove the requisite 'joint action' or 'close nexus' for state action under Section 1983" is "the 'symbiotic relationship' test established by the United States Supreme Court in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856[, 6 L. Ed. 2d 45] (1961)." Hollman v. County of Suffolk, No. 06-CV-3589 (JFB)(ARL), 2011 WL 2446428, at *5 n.5, 7 (E.D.N.Y. June 15, 2011) (citing Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P., 985 F.2d 102, 105 (2d Cir.1993)); see also Roman Catholic Diocese of Rockville Centre, New York v. Incorporated Village of Old Westbury, No. 09 CV 5195(DRH)(ETB), 2011 WL 666252, at *8 n.13 (E.D.N.Y. Feb. 14, 2011) ("The close nexus test has also been referred to as . . . the 'symbiotic relationships' test.") (citing Omnipoint Commc'ns Inc., 233 F. Supp. 2d at 395). Under Burton, "actions of a private party

can be considered state action if the state has 'so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity[.]'" Hollman, 2011 WL 2446428, at *7 (quoting Burton, 3654 U.S. at 725) (internal brackets omitted).  In this regard, courts "often examine whether the government has control over the private actor's 'day-to-day' operations and whether the government shares in any profits the private entity has generated from the challenged conduct. . . . In this way, 'symbiosis' applies only where the alleged relationship has clear nexus with the conduct alleged to be unconstitutional."  Forbes v. City of New York, No. 05 Civ. 7331(NRB), 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12, 2008) (citations omitted).

As an initial matter, the Court recognizes that the Plaintiff cannot satisfy the symbiotic relationship test established under Burton with respect to the profits factor.  See Rambaldi v. City of Mount Vernon, No. 7:01-CV-03648-GAY, 2003 WL 23744272, at *4 (S.D.N.Y. Mar. 31, 2003) ("One of the factors in determining whether a symbiotic relationship between the state and the private actor exists is whether the state shared in any profits.") (quoting Rendell-Baker, 457 U.S. at 843).  This is because the Plaintiff has not offered any evidence suggesting that the Town Defendants directly profited from the challenged conduct.  See Hollman, 2011 WL 2446428, at *7, Forbes, 2008 WL 3539936, at *7.  Indeed, it appears that no profits were even generated from the decision to reject the Plaintiff's volunteer application.

Nevertheless, as with the compulsion test, the Court still finds that the issue of whether the close nexus test applies rests on the resolution of material questions of fact that are suited for a jury determination.  Although the Defendants argue that "there is NO evidence that the Town influence, controlled, participated in, or was even interested in the Foundation's volunteer program or the Foundation's related polices, or more specifically the Foundation's decision to

reject the [P]laintiff's volunteer application," in the Court's view, there is evidence that could lead a reasonable jury to conclude otherwise. For example, given the Town Defendant's history with the Plaintiff in Lynch I and the fact that the Shelter apparently prepared a report concerning the Plaintiff and gave it to Kelly when it was still operated by the Town, a reasonable jury could determine that the Town Defendants did have an interest in whether or not the Plaintiff would be permitted to volunteer at the Shelter.

In addition, the Defendant Bambrick, while still a town official, was also serving as the Animal Shelter supervisor even after it was privatized. In fact, his town position of senior Animal Control Officer "*include[d]* responsibilities as the Animal Shelter Supervisor." (Werbel Decl., Exh. 12.) As Animal Shelter Supervisor, Bambrick was responsible for overseeing the Shelter and all "Shelter employees" were required to "report directly to" him. (Werbel Decl., Exh. 12.) Further, there is evidence supporting the Plaintiff's allegation that Kelly consulted with Bambrick about the Plaintiff's volunteer application, since she forwarded to him the Plaintiff's email replies to her inquiries. Also, the Town's Animal Control Unit and the Shelter were operating out of the same facility. These facts may indicate to a reasonable jury that the Town Defendants and the Foundation Defendants were significantly entwined so as to satisfy the close nexus or joint action test. Of course, on the other hand, a reasonable jury might credit the Defendants' version of events and believe that Kelly alone rejected the Plaintiff's volunteer application without any input from Bambrick or Allen and without any influence from the Town.

The Court has already acknowledged that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Manganiello, 612 F.3d at 161. Therefore, the Court holds that it would be inappropriate for the Court to assess the credibility of the Defendants and the Plaintiff's

testimony or to weigh their evidence.  Accordingly, the Court declines to grant summary judgment for either the Plaintiff or the Defendants as to whether the close nexus or joint action test applies in this case.

### 3.  The Public Function Test

Lastly, under the public function test, "a private entity may be considered a state actor if it performs a function 'traditionally the exclusive prerogative of the State.'"  Forbes, 2008 WL 3539936, at *4 (quoting Jackson v. Metro Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. ED. 2d 477 (1974)).  However, "[t]he public function exception . . . is narrow" and is not satisfied simply because a private group is serving a "public function."  Hollman, 2011 WL 2446428, at *5 (citing Rendell-Baker, 457 U.S. at 842); see also Forbes, 2008 WL 3539936, at *4 (noting that the public function factor "is quite narrow").  Indeed, "only a few functions have been held to be public."  Forbes, 2008 WL 3539936, at *4 (citing Doe v. Harrison, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003).

The Plaintiff argues that the public function test applies here because the "Defendants acted to ban [the Plaintiff] from volunteering her time in a government owned, public building in retaliation for her Free Speech Activities."  (Pl. Mem., pg. 17.)  According to the Plaintiff, such "restrictions on a person's right to Freedom of Speech in a publicly owned building [ ] are" the kind of "function traditionally reserved to the State."  (Pl. Mem., pg. 17.)  However, in the Court's view, there is nothing in the summary judgment record to indicate that the denial of the Plaintiff's volunteer application constituted a complete ban on the Plaintiff's right to enter the Shelter or to exercise her free speech rights there.  Rather, to assess whether the public function test extends to this case, the Court must determine whether the operation of an animal shelter, including the volunteer program, constitutes "the exercise by a private entity of powers

traditionally *exclusively* reserved to the state[.]" <u>Romeo v. Aid to the Developmentally Disabled, Inc.</u>, No. 11-CV-640(JS)(GRB), 2013 WL 1209098, at *4 (E.D.N.Y. Mar. 22, 2013) (quoting <u>Sybalski</u>, 54 F.3d at 259) (internal brackets omitted) (emphasis in the original).

The Court finds that the operation of an animal shelter, including its volunteer program, is not a function exclusively reserved to the state. Although the Plaintiff relies on <u>Fabrikant v. French</u>, 691 F.3d 193 (2d Cir. 2012), the Court believes this reliance to be misplaced. In <u>Fabrikant</u>, the Second Circuit held that "[a]nimal control is part of the state's police power." <u>Id.</u> at 208–09. It further concluded that while "New York has permitted municipalities to delegate [the] public function [of] sterilizing seized animals against their owners' wishes [ ] to private animal control organizations, [ ] the function 'has been traditionally the *exclusive* prerogative of the state[.]" <u>Id.</u> at 209 (citations omitted).

However, here, under the terms of the Agreement, the Foundation only managed the Shelter, and did not undertake any animal control responsibilities, such as seizing animals against their owners' wishes, which remained the obligation of the Town. Moreover, even assuming that the Foundation Defendants did undertake some animal control responsibilities while operating the Shelter, the public function test would still not be applicable because the challenged conduct here had nothing to do with animal control but, rather, involved the volunteer program. In <u>Fabrikant</u>, the Second Circuit specifically recognized that even though an "organization may be a state actor for § 1983 purposes with respect to its provision of animal control services," those decisions it makes with respect to personnel do not constitute state action. <u>Id.</u> at 209 n.12; <u>see also</u> <u>Petrusa v. Suffolk County SPCA</u>, No. 05–CV–6017, 2009 WL 1796996, at *5 (E.D.N.Y. June 24, 2009) ("Although [an organization] may be regulated by the state and therefore some actions taken by its peace officers in performing animal control services

or enforcing its regulations might qualify as state action within the meaning of § 1983, in the context of making employment decisions or implementing internal personnel policies, [the organization] does not perform a governmental function that warrants an inference of state action.") (citations omitted).

In sum, the Plaintiff cannot maintain her § 1983 civil rights claim under the public function test. Therefore, the Court grants the Defendants summary judgment with respect to this issue.

## C. As to Whether the Plaintiff Can Sustain a 42 U.S.C. § 1983 Conspiracy Claim

"A [§] 1983 conspiracy claim requires '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" Deskovic v. City of Peekskill, 894 F. Supp. 2d 443, 465 (2d Cir. 2012) (quoting Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir.1999)). However, "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Id. (quoting Pangburn, 200 F.3d at 72).

For many of the same reasons stated above, the Court finds that there is sufficient evidence to allow the Plaintiff's § 1983 conspiracy claim to survive summary judgment. To reiterate, this evidence includes (1) Bambrick's involvement in the Shelter while still serving as a Town Official; (2) the history between the Town Defendants and the Plaintiff, including the Lynch I litigation; (3) the fact that Kelly admitted to discussing the Plaintiff's volunteer application with Allen and, also, receiving a report from the Shelter concerning the Plaintiff at a time when the Shelter was still being operated by the Town, which may have influenced her decision; and (4) the fact that before making any decision with respect to the Plaintiff' volunteer

application, Kelly forwarded the Plaintiff's email responses about her volunteer application to Bambrick, indicating that she may have discussed the Plaintiff's application with him.

As a reasonable jury could conclude that, based on this evidence, the Defendants conspired to reject her as a volunteer in retaliation for exercising her First Amendment rights in the past, the Court declines to grant summary judgment in favor of the Defendant with respect to the Plaintiff's § 1983 conspiracy claim. Similarly, because a reasonable jury could, conversely, credit the testimony of Kelly, Bambrick and Allen, the Court also declines to grant summary judgment in favor of the Plaintiff on this issue.

**D.  As to Whether the Plaintiff Can Sustain 42 U.S.C. §§ 1985 and 1986 Claims**

42 U.S.C. § 1985(3) prohibits "two or more persons" from "consp[iring] . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." 42 U.S.C. § 1985(3). Under this law, a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). Significantly, the conspiracy must also be motivated by "'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" Thomas, 165 F.3d at 146 (quoting Mian v. Donaldson, Lufkin & Jenrette Secs., Corp., 7 F.3d 1085 (2d Cir. 1993)). In addition, the plaintiff must allege that the conspiracy was "aimed at interfering with rights that are protected against private, as well as official, encroachment." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268, 113 S. Ct. 753, 758, 122 L. Ed. 2d 34 (1993) (citation and internal quotation marks omitted).

The Plaintiff urges the Court to find that the Defendants' alleged conspiracy was "class-based" for § 1985 purposes based on the Plaintiff's status as a whistleblower.  However  the Second Circuit "[has] never extended 1985(3) protection to whistleblowers" and when given the opportunity, "decline[d] to do so[.]"  Tavolnoi v. Mount Sinai Medical Center, 198 F.3d 235, 235 (2d Cir. 1999); see also Nixon v. Blumenthal, No. CIV 3:08CV1933 (JBA), at *6 (D. Conn. Mar. 11, 2010).  Thus, the Court grants summary judgment in favor of the Defendants on the Plaintiff's § 1985 conspiracy claim.

Similarly, because a claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights cannot exist in the absence of a viable Section 1985 claim, the Defendants' motion for summary judgment is also granted as to the Plaintiff's § 1986 claim. See Posr v. Court Officer Shield # 207, 180 F.3d 409, 420 (2d Cir.1999) ("[N]o § 1986 claim will lie where there is no valid § 1985 claim."); Quinn v. City of Long Beach, No. 08 CV 2736(SJF)(ETB), 2010 WL 3893629, at *10 (E.D.N.Y. Sept. 15, 2010) ("[A] § 1986 claim must be predicated upon a valid § 1985 claim.") (quoting Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)).

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' motions for summary judgment is granted with respect to the Plaintiff's §§ 1985 and 1986 claims and these claims are dismissed; and it is further

**ORDERED** that the motions by the Plaintiff and the Defendants for summary judgment are denied with respect to the Plaintiff's § 1983 civil rights and § 1983 conspiracy claim, except that the Court does find as a matter of law that the public function test does not apply in this case and therefore grants summary judgment in favor of the Defendants with respect to that issue.

**SO ORDERED.**
Dated: Central Islip, New York
September 19, 2013

_____/s Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge